IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Eric Berry,<br>Plaintiff,<br><br>vs.<br><br>United of Omaha Life Insurance Company,<br>Defendant. | ) | Civil Action No. 6:25-cv-3908-KFM<br><br>**O R D E R** |

This is an action seeking review of a denial of accidental death benefits available under an employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The plaintiff Eric Berry alleges he was improperly denied these benefits by the defendant United of Omaha Life Insurance Company ("United of Omaha") following the death of his wife Jennifer Weitzel Berry. The plaintiff also seeks attorney's fees and costs for bringing this action pursuant to 29 U.S.C. § 1132(g).

Plans that fall under the governance of ERISA are designed to provide workers with health and financial benefits offered by private employers, and plan administrators are subject to ERISA's procedural safeguards in considering claims made under the terms of the plans. A district court may review the denial of the insurance benefits such as those presented here under 29 U.S.C. § 1132, which provides:

> A civil action may be brought –
>
> (1) by a participant or beneficiary –
>
> > (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

29 U.S.C. § 1132(a)(1)(B).

## PROCEDURAL HISTORY

The plaintiff filed his complaint on May 9, 2025 (doc. 1). The defendant filed its answer on June 30, 2025 (doc. 8). The parties filed a joint stipulation and evidentiary appendix to the joint stipulation on April 20, 2026 (docs. 27, 28). The parties thereafter filed cross-memoranda in support of judgment on April 21, 2026 (docs. 30, 31), and they filed their respective replies on May 5, 2026 (docs. 36, 37). On August 13, 2026, by consent of the parties, this action was referred to the undersigned by the Honorable Timothy M. Cain, then-Chief United States District Judge, to conduct all proceedings and enter a final judgment (docs. 40, 41). As noted in the specialized case management order issued by Judge Cain (doc. 11), where no genuine issues of material fact exist, the court will decide the ERISA benefits issues via summary judgment pursuant to Federal Rule of Civil Procedure 56.

## ISSUE PRESENTED

The issue before the court is whether the defendant United of Omaha abused its discretion in denying the plaintiff Eric Berry's claim for accidental death and dismemberment ("AD&D") benefits. The plaintiff argues that his wife died from an accident as that term is defined in the insurance policies and that the defendant has improperly relied on the policies' exclusion for involuntary intoxication to deny the AD&D benefits. He also argues that the denial was not reasonable because the defendant's decisionmaking process was flawed and did not meet the procedural and substantive requirements of ERISA.

The defendant argues that the language of the insurance policies expressly vests it with discretion to make determinations on the payment of claims. It further argues that the plain language of the policies applies here, particularly the exclusion of AD&D benefits for voluntary intoxication. It submits that its determinative process of the plaintiff's claim for AD&D benefits was procedurally reasonable and in accord with ERISA, resulting in a proper decision that was not an abuse of discretion.

## FINDINGS OF FACT

***Background***

1. Jennifer Weitzel Berry ("Jennifer") was employed by Cliffs Club Services ("Cliffs") as an F&B (Food and Beverage) developer (doc. 28, UNITED-000109).[1]

2. Cliffs maintained an employee welfare benefit plan (the "Plan") governed by ERISA. The Plan offered a Group Term Life Benefits Policy and a Group Voluntary Life Benefits Policy (the "Policies") that were issued and administered by the defendant (doc. 28-1, UNITED-000001, -000047).[2]

3. The Policies contain nearly identical relevant definitions and exclusions, standard life insurance benefits sections, and AD&D benefits riders (UNITED–000033, -000085).

4. The Policies provide for AD&D benefits to be paid when death results from an accident and no exclusion applies (UNITED-000031, -000083).

5. The Policies contain the following definitions relevant to AD&D claims:

> ***Accident*** means an external, sudden, unexpected, unforeseeable and unintended event, independent of Sickness and all other causes. Accident does not include Sickness, disease, bodily or mental infirmity or medical or surgical treatment thereof, or bacterial or viral infection, regardless of how contracted. Accident does not include bacterial infection that is the natural and foreseeable result of an accidental external bodily Injury or accidental food poisoning.
>
> ***Intoxicated*** means having a blood alcohol level, at the time of the Accident, which equals or exceeds the legal limit for operating a motor vehicle in the jurisdiction in which the loss occurs.

(UNITED-000031,-000033,-000041,-000083, -000094, -000095).

---

[1] The administrative record was filed by the defendant as Exhibit 1 to the parties' joint stipulation (doc. 28). The administrative record documents will be cited individually by their Bates Number.

[2] The Plan documents were filed as Exhibit 2 to the parties' joint stipulation (doc. 28-1). The Plan documents will be cited individually by their Bates Number.

6. The Policies contain the following relevant exclusion:

> We will not pay for any loss which:
>
> (l) is caused by the Insured Person and is a result of the injuries the Insured Person receives while voluntarily intoxicated.

(UNITED-000033,-000085).

7. Both Policies contain a provision granting the defendant the authority to interpret the Policies and make a decision as to payment of benefits. The provision also authorizes the insured person to request a review of the decision:

> By purchasing the Policy, the Policyholder grants Us the discretion and final authority to construe and interpret the Policy. This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us. Benefits under the Policy will be paid only if We decide, in our discretion, that a person is entitled to them. In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, and Insured Person or any other third party. Our interpretation of the Policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.
>
> The Policyholder further grants Us the authority to delegate to third parties, including, without limitation, [United of Omaha] and any third party administrator with whom We have contracted to provide claims administration and other administrative services, the discretionary authority granted in the Policy. The Policyholder grants such third party the full discretionary authority granted to Us under this Policy.
>
> The Insured Person or beneficiary has the right to request a review of Our decision. If, after exercising the Policy's review procedures, the Insured Person or beneficiary's claims for benefits is denied or ignored, in whole or in part, the Insured Person of beneficiary may file suit and a court will review the Insured Person or beneficiary's eligibility or entitlement to benefits under the Policy.

(UNITED-000035, -000088).

8. Both Policies contain a section entitled “Claim Review and Appeal Procedures for Life and Accidental Death and Dismemberment Benefits,” which describes claim review procedures, the initial claim decision process, the denial of claims, the claimant’s opportunity to request an appeal, and the defendant’s response process for such an appeal (UNITED-000036,-000089).

9. On the date of her death, November 25, 2023, Jennifer was insured under the Policies for both standard (non-AD&D) death benefits and AD&D benefits, and the plaintiff was named as the beneficiary (UNITED-000109).

***The Accident***

10. On November 25, 2023, at approximately 8:35 p.m., Jennifer and her mother-in-law Elizabeth Berry (“Elizabeth”) were attempting to cross North Main Street in Travelers Rest, South Carolina, on foot when they were hit by a car. North Main Street (US 276) is a four-lane highway. Jennifer was killed, and Elizabeth was injured and was transported to an area hospital (UNITED-000211,-000361).

11. First responders, including Travelers Rest Police Department (“TRPD”) Investigating Officer Adam Bradshaw and a Greenville County Deputy Coroner, arrived at the scene. Inv. Bradshaw determined the point of impact to be directly across from the entrance of Jennifer’s subdivision Glenview Park Place and noted this location “did not support nor establish a crosswalk or any controlled pedestrian access points or painted crossing points across North Main Street. The nearest pedestrian crosswalk is located at the intersection of North Main Street and Henderson Drive” (UNITED-000364). He also noted that “the location surrounding the collision is dark and the nearest lit street light is within the neighborhood located at Glenview Park Place. The lit parking lot at TR Church of God provides slight to no ambient [light]” (UNITED-000365).

12. Inv. Bradshaw noted that he observed two re-usable Starbucks cups in the roadway at the accident scene that smelled like an alcoholic beverage (UNITED-000365).

The Greenville County Deputy Coroner on scene likewise noted the smell of alcohol emanating from the cups, calling the odor “intense” (UNITED-000217).

13. The driver was interviewed by TRPD officers at the scene immediately after the accident and again three days later at the police station (UNITED-000365-366). She stated she did not see the women in the roadway and thought she had struck an animal. After the collision, she made a u-turn and returned to the accident location (*id.*).

14. Elizabeth was interviewed by officers in the hospital and stated that on the day of the accident, she and Jennifer each had a beer earlier in the day. They later filled two Starbucks cups with “Truly’s” alcohol[3] at Jennifer’s house before attending the Travelers Rest Christmas Tree Lighting ceremony at 7:00 p.m. After the ceremony, they briefly stopped at several shops before walking back towards Jennifer’s house. Elizabeth recalled they had made it more than halfway across the road when she fell, and Jennifer was trying to help her up. She then woke up in the hospital (UNITED-000398).

15. A South Carolina Department of Motor Vehicles (“SCDMV”) FR-10 collision report form dated November 25, 2023, was prepared by TRPD Officer Nicole Brown. Officer Brown noted on the form that Jennifer contributed to the collision and that the driver did not contribute to the collision (UNITED-000114).

16. The Greenville County Coroner’s Office case report listed the cause of Jennifer’s death as blunt force injury of the chest. It also contained the narrative of the responding deputy coroner, including her observation regarding the smell of alcohol from the Starbucks cups and her attendance at the autopsy on November 28, 2023 (UNITED-000215).

[3] The administrative record recites this beverage as both “Truly’s” and “cooler” alcohol (UNITED-0000144, -000398).

17. NMS Labs and the Office of the Medical Examiner for Greenville County reported that Jennifer's blood alcohol concentration ("BAC") level was 0.199 grams per 100 ml (BAC 0.199) (UNITED-000198,-000200).

18. The parties do not dispute that Jennifer's alcohol intake was voluntary.

19. It is unlawful for a person to drive a motor vehicle within South Carolina while his/her BAC is eight one-hundredths of one percent or more (BAC 0.08) (UNITED-000191) (citing S.C. Code Ann. § 56-5-2933).

20. On February 6, 2024, TRPD Officer Brown prepared a SCDMV TR-310 collision report form, "Original Amended." Officer Brown noted that Jennifer's toxicology results were added and that Jennifer contributed to the collision and the driver did not contribute to the collision (UNITED-000416).

***The Claim and Initial Denial***

21. The plaintiff made a claim to the defendant for death benefits under the Policies ( UNITED-000442-445). On December 11, 2023, the defendant approved the payment of standard (non-AD&D) benefits under the Policies totaling $84,000.00 (UNITED-000430).

22. By letter dated December 11, 2023, the defendant requested additional documentation – the Medical Examiner's report, the toxicology report, and the accident report – to determine whether AD&D benefits were payable under the Policies (*id.*).

23. By letter dated March 28, 2024, the defendant denied the claim for AD&D benefits, citing the voluntary intoxication exclusion contained in the Policies (UNITED-000406-410). The denial noted the defendant's review of Jennifer's death certificate; TRPD Officer Brown's SCDMV collision report form and its checkbox that Jennifer contributed to the accident; the Medical Examiner's report; and the toxicology results from NMS Labs (*id.*). Specifically, the denial noted Jennifer's BAC of 0.199 when she was struck attempting to cross the road on foot. The letter also advised of the right to appeal the denial (*id.*).

***The Appeal and Ultimate Denial***

24. By letter dated May 21, 2024, the plaintiff's counsel lodged an appeal of the defendant's denial of AD&D benefits (UNITED-000222-224). Submitted with the appeal letter was the TRPD Incident Report and Supplemental Reports, Google Maps "Street View" photos of the incident location, and a recording of TRPD officers' interview with Elizabeth (UNITED-000225-236). The letter challenged the denial, arguing that Jennifer's death was not caused by intoxication but rather by two contributing factors: (1) the failure of the driver to keep a lookout for pedestrians and to slow or stop her vehicle prior to striking Jennifer and Elizabeth, and (2) Elizabeth falling in the roadway and causing Jennifer to render aid, which kept her in the path of the vehicle (UNITED-000222).

On the first factor, counsel argued that nothing about the roadway would have prevented the driver from seeing Jennifer and Elizabeth, and the driver should have been able to avoid the collision (UNITED-000223). Moreover, the driver's automobile insurance carrier had accepted liability and offered the limits of its coverage for the driver. On the second factor, counsel pointed to Inv. Bradshaw's conclusion in the TRPD reports that the event "was a terrible accident which resulted in the death of a pedestrian and severe injury of another. It is indicated circumstantially and by evidence collected during this investigation that [Elizabeth] fell as she entered the roadway from the direction of the Swamp Rabbit Trail. [Jennifer] attempted to assist [Elizabeth] when both parties ended up immediately and directly in the path of the motor vehicle" (UNITED-000222) (quoting UNITED-000366). Counsel also argued that the "Supreme Court of South Carolina has held that 'an exclusion clause in an insurance contract with respect to intoxication will not be permitted to prevent recovery unless the insurer is able to show by the greater weight or preponderance of the evidence some causal connection between insured's condition and his injury or death'" (UNITED-000223) (quoting *Outlaw v. Calhoun Life Ins. Co.*, 119 S.E.2d 685, 690 (S.C. 1961)).

25. By letter dated June 20, 2024, the defendant upheld it previous denial of AD&D benefits, citing its appellate review of all of the above-referenced reports, including the additional items submitted by the plaintiff on May 21, 2024 (UNITED-000185-190). Ultimately, it determined that Jennifer's intoxication triggered the exclusions contained within the Policies. In its denial, the defendant stated:

> A copy of th NMS Labs Toxicology Report is included in the claim file and demonstrates [Jennifer] had a BAC of 0.199 g/ml, more than twice the legal limit, at the time of her death. At that level of intoxication, it is reasonable to conclude [Jennifer] would have experienced significant impairment in her functionality, including vision, coordination, balance, reaction times, and judgment. It is also reasonable to conclude that [Jennifer's] intoxication contributed to her actions in attempting to cross U.S. highway 276 at 8:25 p.m. at an unlit and unmarked area, with no pedestrian crosswalk or access point, which resulted in her being struck by an oncoming vehicle that led to her death.

(UNITED-000187).

## CONCLUSIONS OF LAW

### *Standard of Review*

As noted above, this court may review the denial of ERISA governed-plan benefits to a beneficiary pursuant to 29 U.S.C. § 1132(a)(1)(B). When a plan vests the plan administrator with discretionary authority to make eligibility determinations, a district court reviews the administrator's decision under the abuse of discretion standard, as set forth in *Solomon v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 860 F.3d 259 (4th Cir. 2017):

> When considering an ERISA benefit determination, "we review the district court's decision de novo, employing the same standards governing district court review of a plan administrator's discretionary decision." *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 360 (4th Cir. 2008). We review the Board's decision for abuse of discretion, upholding any reasonable decision. *Id.* at 359. A decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). In *Booth v. Wal–Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), this court

articulated a set of nonexclusive factors we consider in making the reasonableness determination:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.
>
> [*Booth*, 201 F.3d at 342-43.]

*Id.* at 264-65. "The abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Scott v. Eaton Corp. Long Term Disability Plan,* 454 Fed.Appx. 154, 160 (4th Cir. 2011) (quoting *Evans v. Eaton Corp. LTD Plan,* 514 F.3d 166, 171 (4th Cir. 2004).

***Analysis***

To determine the issue of whether the defendant abused its discretion in denying the plaintiff's claim for AD&D benefits, the undersigned looks to the relevant *Booth* factors set out above for analysis.

The Language of the Plan

"When interpreting the benefits provisions of ERISA-regulated insurance plans, the plain language is paramount." *Eickleberry v. ReliaStar Ins. Co.*, 469 F.3d 340, 343 (4th Cir. 2006). "To achieve this objective, the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med.Servs., LLC v. Sereboff,* 407 F.3d 212, 220 (4th Cir. 2005). Accordingly, a plan administrator must reasonably apply the relevant terms of insurance policies if invoked by the evidence presented. Here, the defendant was presented with evidence that an accident occurred and additional evidence that Jennifer was intoxicated when the accident took place.

Ultimately, the claim was denied under the rationale that the Policies expressly excluded recovery based on Jennifer's voluntary intoxication.

As set out above, the Policies contain the following provision:

> By purchasing the Policy, the Policyholder grants Us the discretion and final authority to construe and interpret the Policy. This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us. Benefits under the Policy will be paid only if We decide, in our discretion, that a person is entitled to them.

(doc. 28-1, UNITED-000035, -000088). This language clearly grants the defendant broad discretion in considering claims like the one presented here and informs this court that the above-cited standard of review applies.

The Policies also contain the defined terms of "accident" and intoxicated" and an exclusion for voluntary intoxication. The plaintiff argues that the Policies' definition of the term "accident" controls here, as Jennifer died as a result of an "external, sudden, unexpected, unforeseeable and unintended event." Notably, the defendant does not appear to challenge whether the incident qualified as an "accident" but instead relies on the Policies' language that expressly excludes the payment of a claim for a loss "caused by the Insured Person and is a result of the injuries the Insured Person receives while voluntarily intoxicated." The undersigned finds that both the term "accident" and the voluntary intoxication exclusion contained in the Policies are applicable based on the evidence of the administrative record, and it was not unreasonable for the defendant to consider both in its determination.[4]

---

[4] In emphasizing the defined term "accident" and the word "caused" in the voluntary intoxication exclusion, the plaintiff suggests that the court undertake the analysis set out in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990), to determine if this event should qualify as a compensable accident (doc. 30 at 13-16). The *Wickman* framework requires a reviewing court to undertake a subjective analysis to determine whether the insured expected that her actions could result in injury or death and then an objective analysis to determine the reasonableness of the insured's expectations. The objective inquiry asks "whether a reasonable person, with the background and characteristics similar to the insured, would have viewed [death] as highly likely to occur as a result of the insured's intentional conduct." *Id.* at 1088. At the outset, the undersigned

The Purpose and Goals of the Plan

The plaintiff submits that the Plan and its Policies were offered to Jennifer to provide a safety net of cash benefits for her beneficiary in the event of her accidental death and the corresponding loss of her income; by denying these AD&D benefits, the defendant is violating the Plan's very purpose. However, while a plan administrator – like the defendant here – has a responsibility to approve claims that are covered under its benefits policies, it likewise has a duty to all of its insured members under an ERISA plan to deny claims that do not qualify for compensation. Nothing in the administrative record suggests that the defendant abused its discretion or acted in an unreasonable or improper manner to thwart the purposes and goals of the Plan in denying the plaintiff's claim.

The Adequacy of the Materials in the Decision-Making Process

The administrative record consists of the Policies, the claim forms, Jennifer's death certificate, the South Carolina Department of Motor Vehicles FR-10 and TR-310 collision reports, the toxicology report from NMS labs and the Greenville County Office of the Medical Examiner, the Greenville County Coroner's Office report, the incident and supplemental incident reports from the TRPD, Google Map photographs of the accident location, and the recorded statement from Elizabeth. Notably, the plaintiff does not suggest that these materials were suspect or unreliable. Instead, the plaintiff argues these materials were inadequate to support the defendant's denial, particularly when other materials were

---

notes that *Wickman* was decided after a full trial in which the judge performed a *de novo* review of the facts and was not limited by the abuse of discretion standard as required here. Even in this broader context, while the undersigned agrees with the plaintiff that *Wickman*'s subjective prong suggests that Jennifer's state of mind can be gleaned from Elizabeth's statement, such that Jennifer did not expect her actions of entering the roadway and then attempting to help Elizabeth while in the roadway to result in her own death, the objective prong does not weigh in the plaintiff's favor. Fair-minded objectivity requires the reviewer to consider all the relevant circumstances that led up to the tragic event, including evidence of Jennifer's own consumption of alcohol and high BAC when she was struck. Using the *Wickman* framework, a reasonable person engaged in the same conduct would have foreseen that serious injury or death under these circumstances was likely to result. Accordingly, as Jennifer's death was not objectively "unexpected" given her actions, the *Wickman* analysis is not helpful to the plaintiff, as it ends with the incident not meeting the Policies' definition of an unexpected "accident."

available. Plaintiff's counsel maintains that she was able to obtain via subpoena "the entire accident file" from the TRPD, consisting of body-cam videos, accident reconstruction reports, dash cam videos, the camera footage from a nearby business, recordings of 911 calls, photographs form the scene, fire department reports, search warrants for medical records, DMV reports, and videos of interviews with witnesses and the driver of the vehicle. The plaintiff complains that though these additional items were clearly available, the defendant made no effort to obtain and review them before making its final decision. However, the undersigned notes that the plaintiff did not submit these additional items with his appeal letter of May 21, 2024, despite having the opportunity to do so (the plaintiff made other submissions with the appeal: the TRPD incident and supplemental reports, the Google Map photographs, and Elizabeth's recorded interview). Nor has the plaintiff explained how these additional materials would likely have altered the defendant's analysis, such that the defendant would not have applied the voluntary intoxication exclusion upon considering them. While a plan administrator cannot bypass potential evidence that it knows could be determinative, it is not required to track down all items or reports that may have been generated as a result of the incident. See *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014) ("Plan administrators possess limited resources, and ... there are practical constraints on their ability to investigate the volume of presented claims"). With nothing to suggest otherwise, the undersigned finds that the defendant had adequate materials consisting of substantial evidence to fully and fairly consider the claim.

<u>The Decisionmaking Process</u>

ERISA obligates a plan administrator "to use a deliberate, principled reasoning process and to support it decision with substantial evidence." *McKoy v. Int'l Paper Co.*, 488 F.3d 221, 223 (4th Cir. 2007). An administrator must also abide by the claims and review procedure set forth in a plan or its underlying benefits policies.

Here the Policies provide a section entitled Claim Review and Appeal Procedures For Life and Accidental Death and Dismemberment Benefits (UNITED-000036, -000089). This section describes (1) <u>Claim Review Procedures</u>, including the time periods

to evaluate the claim; (2) the Initial Claim Decision, describing the communications to be made between the defendant and the claimant, including in the event that additional information is requested; (3) Claim Denials, including: the specific reason for the denial, reference to the specific Policy provisions on which the denial is based, and a description of the appeal procedures, the right to an appeal, and the right to bring a civil action following the appeal process; (4) the Opportunity to Request an Appeal, describing the information needed by a claimant to pursue an appeal; and (5) Response to Appeals, including the final decision and the information on which it was based (UNITED-000036, -000089).

The administrative record here reveals that the defendant complied with the Policies Claim and Review Procedures. First, it promptly considered the plaintiff's claim for death benefits, paying the standard (non-AD&D) benefits soon after the initial claim was made. Regarding the claim for AD&D benefits, the defendant did not outright deny the claim but instead requested additional information – the Medical Examiner's report, the toxicology report, and the accident report – before making a decision. After receiving and reviewing these materials, the defendant denied the claim based on the voluntary intoxication exclusion contained within the Policies. The denial letter noted the reason for the denial (Jennifer's voluntary intoxication), the specific Policy provision supporting the denial (the exclusion for voluntary intoxication), and the right to request an administrative appeal (UNITED-000406). Through counsel's letter dated May 21, 2024 (UNITED-000389-391), the plaintiff requested an administrative appeal, supplying additional information to the defendant for its consideration: the TRPD incident and supplemental reports, the Google Map photographs of the accident location, and the recording of Elizabeth's statement. By a written decision dated June 21, 2024, the defendant confirmed its initial decision and denied the appeal. The defendant reached the decision after reviewing all the records in its claim file. It expressly relied on the toxicology report that Jennifer's BAC was .199, and the South Carolina Traffic Collision Report (TR-310) dated February 6, 2024, noting that "toxicology results were added" and indicating that Jennifer contributed to the

accident (while the driver did not). With this evidence, the defendant reasoned that the voluntary intoxication exclusion applied, as Jennifer's high level of intoxication would have significantly impaired her "functionality, including vison, coordination, balance, reaction times, and judgment," and it "contributed to her actions in attempting to cross U.S. highway 276 at 8:25 p.m. at an unlit and unmarked area, with no pedestrian crosswalk or access point, which resulted in her being struck by an oncoming vehicle" (UNITED-000187). The written decision also provided information on the right to appeal by filing a civil action (UNITED-000188). Accordingly, the undersigned finds that the process utilized by the defendant in reaching its decision complied with the Claims Review and Appeal Procedures section of the Policies and did not violate the procedural requirements of ERISA, as the plaintiff received a full and fair review.

Despite this procedure, the plaintiff argues that the defendant's decision to deny AD&D benefits was substantively flawed and unreasonable, as it ignored certain record entries and cherry-picked others to support its conclusion that Jennifer's voluntary intoxication was the cause of her death. Specifically, the plaintiff references the Medical Examiner's report that Jennifer's death was caused by blunt force trauma to the chest and the TRPD's incident report summary as the only documents assigning a cause of death, with neither mentioning Jennifer's intoxication. The undersigned disagrees with this assessment. While these documents do not pronounce intoxication to be the cause of death, this omission does not remove intoxication from the reviewer's overall consideration of the evidence.

As set out above, the defendant expressly relied upon the toxicology report and the TR-310 in arriving at its decision both initially and on appellate review. The toxicology report lists Jennifer's BAC at .199, more than twice the legal limit, and these results were added in the amended TR-310 that determined Jennifer – and not the driver – contributed to her death. Based on this substantial evidence, it was not unreasonable to conclude that Jennifer's voluntary intoxication significantly impaired her functional abilities and judgment, including her judgment to enter the unlit highway at an unmarked location

in the nighttime. Accordingly, the undersigned finds that the defendant's decision to deny the claim for AD&D benefits on the basis of the voluntary intoxication was not an abuse of discretion and was based on substantial evidence.

## CONCLUSION

For the reasons stated herein, the undersigned finds that no genuine issues of material fact exist, and the defendant is entitled to summary judgment. Accordingly, the defendant's memorandum in support of judgment is granted, and the plaintiff's memorandum in support of judgment is denied.

IT IS SO ORDERED.

s/Kevin F. McDonald
United States Magistrate Judge

November 19, 2026
Greenville, South Carolina